**IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

|  |  |  |
|---|---|---|
| **SALLY MARTIN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:21-cv-1265** |
| | ) | |
| **COLOPLAST CORP., and** | ) | **JURY TRIAL DEMANDED** |
| **COLOPLAST MANUFACTURING** | ) | |
| **US, LLC,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## COMPLAINT

Plaintiff Sally Martin ("Plaintiff"), by and through her attorneys of record, and for her causes of action against Defendants Coloplast Corp., and Coloplast Manufacturing US, LLC, (collectively referred to as "Coloplast" or "Defendants") states and alleged as follows:

### PARTIES

1.      Plaintiff is now and was at all times material hereto a citizen and resident of Florida, residing in Orlando, Florida. Plaintiff was implanted with and subsequently injured by Defendants' Aris transobturator vaginal mesh device in Orlando, Florida.

2.      Defendant Coloplast Corp. ("Coloplast Corp.") is a corporation organized and existing under the laws of the State of Delaware, maintaining its principal place of business at West River Road North, Minneapolis, Minnesota 55411. Coloplast Corp. is a wholly-owned U.S. sales and marketing subsidiary of Coloplast A/S, a Denmark corporation.

3.      Defendant Coloplast Manufacturing US, LLC is a limited liability corporation organized and existing under Delaware law maintaining its principal place of business as 1940 Commerce Drive, North Mankato, MN, 56002. Its registered office is 560 Park Street, #6, St. Paul,

Minnesota 55103. Coloplast Manufacturing US, LLC is a wholly-owned subsidiary of Coloplast Corp.

4.     On February 8, 2001, Mentor Worldwide LLC ("Mentor") announced the purchase of Porges S.A.,[1] a subsidiary of Sanofi-Synthelabo. At the time, Porges held the leading market share for urological products in France and held a strong position throughout Europe was one of the largest manufacturers of urological products, supplying a complete range of products including products intended to treat incontinence.

5.     Coloplast Corp., and Coloplast Manufacturing US, LLC are collectively referred to herein as Coloplast.

6.     All acts and omissions of the above-referenced Defendants as described herein were done by their agents, servants, employees, and / or owners, acting in the course and scope of their respective agencies, services, employments, and / or ownership.

### VENUE AND JURISDICTION

7.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Plaintiff was implanted with and subsequently injured by Defendants' Aris product in Orlando, Florida, which is in this judicial district. In addition, the Defendants do business in this judicial district, subjecting the Defendants to personal jurisdiction in this action and making them "residents" of this judicial district.

8.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds Seventy-Five Thousand Dollars ($75,000) exclusive of interest and costs and complete diversity of citizenship exists between the Plaintiff and Defendants.

---

[1] Porges is a wholly owned subsidiary of Coloplast A/S organized under the laws of France, where it also maintains its principal place of business.

## FACTUAL ALLEGATIONS

### A.    General Factual Allegations

9.    This is an action to recover damages for personal injuries suffered by Plaintiff as a result of the medical device Aris, as tested, studied, researched, evaluated, endorsed, designed, formulated, compounded, manufactured, produced, assembled, inspected, distributed, marketed, labeled, promoted, packaged, advertised for sale, prescribed, sold or otherwise placed in the stream of interstate commerce by Defendants.

10.    At all times herein mentioned the officers and directors of Defendants participated in, authorized and directed the production and promotion of the Aris mesh when they knew, or with the exercise of reasonable care should have known, of the hazards and dangerous propensities of the Aris mesh and thereby actively participated in the tortious conduct which resulted in the injuries suffered by Plaintiff.

11.    At all times material to this action, Defendants have designed, patented, manufactured, packaged, labeled, marketed, sold, and distributed a line of pelvic mesh products, intended to treat pelvic organ prolapse and / or urinary incontinence. Each of these products was cleared for sale in the United States after the Defendants made assertions to the Food and Drug Administration of "Substantial Equivalence" under Section 510(k) of the Food, Drug and Cosmetic Act; this clearance process does not require the applicant to prove safety or efficacy.

12.    The Aris consists of a transobturator ("groin") mesh and introducer needles. The mesh is an implantable support mesh made from knitted monofilament polypropylene fibers. The introducer needles are necessary for the implantation of the mesh and are included in the Aris mesh kit.

13.     In 2005, the Aris groin mesh was cleared by the the Food and Drug Administration through "Substantial Equivalence" to the Mentor ObTape groin mesh under Section 510(k) of the Food, Drug and Cosmetic Act.

14.     In the application to the FDA, Defendants stated the Aris mesh was "substantially equivalent in material, function, performance and design to the Mentor ObTape" mesh.

15.     Mentor began to first market its ObTape brand groin vaginal mesh in the United States in 2003.

16.     Upon information and belief, at the time that Mentor first introduced its ObTape brand groin vaginal mesh to the market in 2003, the product had undergone inadequate pre-market testing to determine the safety and efficacy of the medical device prior to implantation in humans, and said testing was limited to animal testing (and included only three rabbits).

17.     However, even the limited animal testing conducted by Mentor prior to first marketing the ObTape brand groin vaginal sling in 2003 had demonstrated that the medical device caused adverse tissue reactions in the rabbits.

18.     After 2003, upon information and belief, Mentor performed no additional safety or efficacy testing in human vaginal tissues to confirm that the medical device was safe and effective for use in women.

19.     From 2003 through March of 2006, Mentor continued to manufacture, market, distribute, and sell this device to thousands of women even though Mentor knew that the product had been inadequately tested for safety and efficacy (both prior to and after its approval for sale in the United States), contained significant manufacturing and design defects that posed unnecessary risks to patients, and also despite knowing that numerous patients had suffered harm attributable to the defective condition of the medical device.

20.     Prior to Plaintiff's implantation with this device, Defendants were on notice of numerous patients who had been harmed by its ObTape brand groin vaginal mesh, including a significant number of women who suffered vaginal erosion, infection, complex recurring extrusions, chronic vaginal, pelvic and groin pain, inability to engage in intercourse, perforation and / or abscess after implantation with its device.

21.     Mentor did not cease to manufacture, market, distribute, and sell its ObTape brand groin vaginal mesh until approximately March of 2006, and even after its withdrawal of the medical device from the market due to safety issues, Mentor failed to provide adequate warnings and notice to physicians and / or patients regarding the unacceptably high rate of vaginal ObTape brand groin vaginal mesh and the best methods for treating patients who were previously implanted with the defective devices, including Plaintiff.

22.     This failure to provide adequate warnings and information to physicians and / or patients following withdrawal of the medical device from the market in March of 2006 led to unnecessary suffering and delay in obtaining appropriate medical treatment for Plaintiff as well as the thousands of other women who were implanted with the defective medical device.

23.     During this same time period, the Aris groin mesh was first marketed in the United States after it received clearance due to its substantial equivalence to the ObTape groin mesh in 2005.

24.     In May 2005, Mentor announced the U.S. launch of its new Aris(TM) Trans-Obturator Tape. According to Mentor's launch reports, "specifically designed to utilize Mentor's patented Trans-Obturator Technique (T.O.T.(TM)), Aris represents the newest technical achievement and advanced generation of trans-obturator slings for the treatment of stress urinary incontinence in women." "The introduction of Aris furthers Mentor's position as a pioneer of the

trans-obturator method for treating stress incontinence in women," commented Joshua H. Levine, President and Chief Executive Officer of Mentor Corporation. "We are committed to driving innovation in the field of women's health to provide better solutions for physicians and the patients they serve." Analytic Biosurgical Solutions ("ABISS") FDA registration lists its proprietary device as "Mentor Aris Trans-Obturator Tape and Surgical Kit."

25.     On October 12, 2005, ABISS and Mentor entered into a number of agreements pursuant to which ABISS licensed a number of ABISS' products to Mentor, which were thereafter marketed by Mentor under its trademarks, including its Aris trademark. On June 2, 2006, Mentor sold its surgical, urological, clinical and consumer healthcare business segments to Coloplast for $461,145,398, including inter alia, Mentor's October 12, 2005 agreements with ABISS and Mentor's Aris and Novasilk Pelvic Mesh Products.

26.     At all times, the product marketed and sold in the United States as "Mentor Aris Trans-Obturator Tape and Surgical Kit" was manufactured by ABISS and, at all times after October 2, 2006, the product "Mentor Aris Trans-Obturator Tape and Surgical Kit" was exclusively marketed and sold in the United States by Coloplast Corp. from its principal place of business in Minneapolis, Minnesota.

27.     ABISS is registered with the FDA, Registration Number 3004756681, as the manufacturer of "Mentor Aris Trans-Obturator Tape and Surgical Kit."

28.     Coloplast Corp.'s annual report for 2009-2010 reported that "the majority of our acquired patents and trademarks are associated with the acquisition of Mentor's urology, business in 2006." The annual report also said that Mentor signed "a non-competition clause prohibiting Mentor (the seller) from selling urology products for the next seven years…."

29.     Coloplast Corp.'s website describes its various products, including those for treating (i) "Pelvic Organ Prolapse" and (ii) "Stress Urinary Incontinence," including "Sling Procedures." A press release issued by Coloplast Corp. described Coloplast Corp.'s corporate headquarters at 1601 West River Road in Minneapolis and stated that "Denmark-based Coloplast…selected north Minneapolis as the new home for its North American headquarters in 2006." According to the press release the new headquarters "will include one of the company's three global Innovation Centers."

30.     At all relevant times, Defendants were in the business of developing, designing, licensing, manufacturing, distributing, selling, marketing, advertising, and delivering, and introducing into interstate commerce, including, *inter alia*, within the United States, either directly or indirectly through third parties, subsidiaries or related entities, Pelvic Mesh Products.

31.     At all relevant times, Pelvic Mesh Products were used to treat pelvic organ prolapse and urinary incontinence.

32.     Stress Urinary Incontinence is a type of incontinence characterized by leakage of urine during moments of physical stress.

33.     Surgical mesh, including mesh used in Pelvic Mesh Products, is a medical device that is generally used to repair weakened or damaged tissue. It is made from absorbable or non-absorbable synthetic material or absorbable biologic material. In urogynecologic procedures, surgical mesh is permanently implanted to reinforce the weakened vaginal wall to repair pelvic organ prolapse or to support the urethra to treat urinary incontinence. Groin mesh products, like the one used in this case, are implanted below the urethra and in the groin area. The sub-urethral mesh portion is intended to provide support to the urethra, thus alleviating incontinence. The groin

mesh portion provides no benefit in providing support for the urethra and thus is not intended to treat the incontinence.

34.     Defendants made the decision to use and continue to market a knitted polypropylene mesh with small pores in the Aris groin mesh medical device. Numerous scholarly articles and research have concluded polypropylene mesh with small pores is dangerous and increases the frequency, severity and duration of injuries from transvaginal mesh devices. Specifically, the small pores polypropylene mesh causes complex erosions and extrusions in women that persistently recur, chronic pelvic, vaginal and groin pain, inability to engage in intercourse and the complex painful revision surgeries to cut and tug mesh pieces from the women's vaginas and groins. Defendants made the decision to continue to market the Aris groin mesh with small pores and not to warn of the increased dangers associated with monofilament knitted polypropylene mesh. On information and belief, the Aris groin mesh has the smallest pores of any transvaginal mesh that has not been removed from the market in the United States.

35.     Defendants made the decision to use and continue to market a low elasticity or stiff polypropylene mesh in the Aris groin mesh medical device. Coloplast touts the stiffness of its Aris groin mesh as having "low elasticity." Numerous scholarly articles and research have concluded stiff polypropylene mesh is not compatible with soft vaginal tissue, is dangerous and increases the frequency, severity and duration of injuries from transvaginal mesh devices. Specifically, the stiff polypropylene mesh causes complex erosions and extrusions in women that persistently recur, chronic pelvic, vaginal and groin pain, inability to engage in intercourse and the complex painful revision surgeries to cut and tug mesh pieces from the women's vaginas and groins. Defendants made the decision to continue to market the Aris groin mesh with stiff mesh and to not warn of the

increased dangers associated with using a stiff polypropylene mesh. On information and belief, the Aris groin mesh is the stiffest transvaginal mesh marketed in the United States.

36.    Defendants made the decision to use and continue to market a low elasticity or stiff polypropylene mesh in the Aris groin mesh medical device without the use of a protective sheath covering the mesh during the manufacturing, shipment and implantation of the groin mesh. Numerous scholarly articles and research have concluded stiff polypropylene mesh is dangerous and increases the frequency, severity and duration of injuries from transvaginal mesh devices. Specifically, the stiff polypropylene mesh without a protective sheath covering the mesh during implantation causes vaginal and groin tissue inflammation, vaginal and groin tissue irritation, vaginal and groin tissue damage and chronic vaginal and groin pain when the stiff monofilament groin mesh traverses through the groin and vagina of women during implantation. Defendants made the decision to market the Aris groin mesh without a protective sheath on the stiff mesh and to not warn of the increased dangers associated without the protective sheath covering stiff polypropylene mesh during manufacturing, shipment and implantation of the mesh. On information and belief, the Aris groin mesh is the only groin mesh in United States to treat incontinence that does not utilize a protective sheath.

37.    Defendants made the decision to use and continue to market the stiff polypropylene mesh with small pores and without a protective sheath in the Aris groin mesh medical device resulting in mesh that contracts, curls, coils, migrates and erodes through vaginal tissue after it is introduced in to soft vaginal tissue. Numerous scholarly articles and research have concluded stiff polypropylene mesh with small pores is not compatible with soft vaginal tissue, is dangerous and increases the frequency, severity and duration of injuries from transvaginal mesh devices because of the mesh does not hold in place after it is introduced into the body. Specifically, the stiff

polypropylene mesh with small pores contracts, moves around, migrates, deforms, curls, coils, folds over and causes complex erosions and extrusions in women the persistently recur, chronic pelvic, vaginal and groin pain, in ability to engage in intercourse and the complex painful revision surgeries to cut and tug mesh pieces from the women's vaginas and groins. Defendants made the decision to continue to market the Aris groin stiff mesh with small pores and to not warn of the increased dangers associated with using a stiff polypropylene mesh with small pores and no protective sheath that does not hold in place after it is implanted. On information and belief, the Aris groin mesh has the lowest holding force of any transvaginal mesh marketed in the United States to treat incontinence.

38.     Defendants chose to design and market the Aris groin mesh without a stiff mesh and with no protective sheath to appeal to its customers with an attempt to "reduce the complexity of the procedure and surgery time" and for a "quick insertion." Decreasing the surgery time is an important marketing tool used by Defendants to sell the device to surgeons. Defendants knew that while this design feature could aid in the marketing of the device, it was in exchange for the serious, life-long, irreversible injuries to patients that would be caused by this design.

39.     The scientific evidence shows that this stiff polypropylene mesh with small pores as implanted in the Plaintiff is biologically incompatible with vaginal tissue and when used as a woven or knitted alloplastic textile prosthetic mesh in the vagina, stiff small pore polypropylene mesh promotes a severe foreign body reaction and chronic inflammatory response in women implanted with Defendants' Pelvic Mesh Products. This "host defense response" by a woman's pelvic tissues promotes deformation, curling, coiling and stiffening of the mesh, mesh migration, contraction and shrinkage of the mesh, excessive scarring and scar plating around the mesh, and degradation of the polypropylene mesh and the pelvic tissue, and causes chronic inflammation of

the pelvic tissue and tissue damage, chronic infectious response and chronic pelvic, vaginal and groin pain. It also can cause new-onset painful sexual relations, significant urinary dysfunction, vaginal shortening and anatomic deformation, and can contribute to the formation of severe adverse reactions to the mesh.

40.     Defendants did not, and have not, adequately studied the extent of the risks associated with the Aris groin mesh intended to be permanently implanted in a woman's body. On information and belief, Defendants have not made any effort or spent any time, money or resources to conduct long-term randomized controlled trials with safety as the primary end-point to study the frequency, severity and duration of adverse events associated with the Aris groin mesh.

41.     Defendants knew or should have known that the Aris stiff mesh with small pores unreasonably exposed patients to the risk of serious harm while conferring no benefit over available feasible alternatives that do not involve the same risks. At the time Defendants began marketing the Aris, and at the time Plaintiff was implanted with the Aris groin mesh, Defendants were aware that the Aris was associated with life-long irreversible adverse events and that the Aris was unreasonably dangerous and increased the frequency, severity and duration of adverse events due to its unsafe design features described herein. Notably, Defendants were aware the Aris was substantially equivalent in material, function, performance and design to the Mentor ObTape mesh, which had been removed from the market due to safety concerns associated with the dangerous design features of the Obtape.

42.     On information and belief, Defendants have not made any effort or spent any time, money or resources in educating physicians, or patients, in how, if at all possible, to safely remove the Aris groin mesh from a woman's body if complications occur.

43.     Defendants misled doctors and patients as to the performance, efficacy and safety of the Aris groin mesh device.

44.     After a segment on 60 Minutes detailing the safety risk associated with mesh imported from China, Defendants distributed a letter mollifying concerns of its consumers but failed to ever mention the Aris groin mesh was stiffest mesh on the U.S. market, had the smallest pores of any groin mesh on the U.S market and had the lowest holding force of any groin mesh on the U.S. market and the safety concerns associated with these design features of the Aris.

45.     Defendants misrepresent on their website that the Aris groin mesh has large pores, is "less dense" than other mesh, performs "similar to collagen fibers" where the mesh is implanted, and due to the design of the mesh there is only minimal "trauma to the surrounding tissue" when the mesh is implanted and traverses through a woman's vaginal tissue.

46.     Defendants misrepresent the Aris groin mesh "offers high success rates and low complications." Defendants withdrew this statement from their website recently after it was included in an expert report submitted in the transvaginal mesh multi-district litigation.

47.     Defendants misrepresent the Aris groin mesh is "minimally invasive."

48.     Defendants misrepresent the Aris groin mesh has "optimal tissue integration" and the design the mesh minimizes an increase in inflammatory response.

49.     Defendants intended patients and doctors to rely on these statements in choosing the Aris groin mesh.

50.     Defendants knew or should have known the statements were false.

51.     Defendants knew there was no adequate scientific data to support these statements.

52.     Defendants failed to conduct adequate research to determine whether these statements had any basis in fact.

53.     To this day, the Aris groin mesh continues to be marketed by Defendants to the medical community and to patients as safe, effective and reliable medical devices, implanted by safe, effective and minimally invasive surgical techniques, and as safer and more effective as compared to available feasible alternative treatments of stress urinary incontinence, and other competing products.

54.     Defendants omitted and downplayed the risks, dangers, defects, and disadvantages of the Aris groin mesh, and advertised, promoted, marketed, sold and distributed the Aris groin mesh as a safe medical device with high success and low complications when Defendants knew or should have known that the Aris groin mesh was not safe for its intended purpose, and that the Aris would cause, and did cause, serious medical problems, and in patients, including Plaintiff, catastrophic injuries. The magnitude and frequency of these problems were not disclosed and were hidden from physicians and patients.

55.     Contrary to Defendants' representations and marketing to the medical community and to the patients themselves, groin mesh has high rates of failure, injury, and complications, fail to perform as intended, require frequent and often debilitating re-operations, and have caused severe and irreversible injuries, conditions, and damage to a significant number of women, including Plaintiff, making the Aris groin mesh defective under the law.

56.     Defendants have paid millions of dollars to individual consultant surgeons to adopt the device in their practice to induce other healthcare providers in purchasing their products. These "seeding trials" are a form of marketing conducted in the name of research by Defendants, specifically designed to target product sampling towards selected consumers.

57.     Defendants have paid millions of dollars to consultant surgeons to have access and control over data that would be published on the safety of the devices used by their consultant surgeons.

58.     Defendants have paid millions of dollars to individual consultants to help market their products and conceal the safety risks of their products to the medical community and public at large.

59.     Defendants have paid millions of dollars to individual consultants and groups to lobby and make misrepresentations on their behalf to healthcare providers, safety organizations and the public and improperly influence articles and coverage related to their devices including the Aris groin mesh.

60.     These individual consultant surgeons have been paid millions of dollars by manufacturers of vaginal mesh devices, like the Aris groin mesh, without the knowledge of Plaintiff, her medical providers or the medical community. Defendants have improperly concealed the total amounts of money they have paid consultants and groups to market, lobby and make misrepresentations on their behalf related to the safety of their devices including the Aris groin mesh.

61.     In addition to the defects listed herein, the design of the Aris groin mesh causes adverse tissue reactions and tissue death with a chronic inflammatory response, the mesh becomes more rigid and stiff and hardens with the presence of mesh in the this area of the body, and the mesh is inserted into and through an area of the body that is blood vessel rich, nerve dense, and bacteria laden leading to permanent nerve injury and associated chronic, intractable neuropathic pain, contaminated permanently-implanted mesh causing chronic infections, subclinical infections and biofilms, enhanced chronic inflammatory response, chronic wound healing with tissue

destruction, as well as numerous other adverse reactions and serious and permanent injuries that surgeons are unable to effectively completely alleviate due to the adherence of the mesh and scar-plating around the mesh in the woman's groin and vagina.

62.    The Aris groin mesh is also defective due to Defendants' failure to adequately warn or instruct Plaintiff and / or her health care providers, while at the same time misrepresenting the safety and performance features of the Aris groin mesh.

63.    Defendants under reported and continue to underreport information about the propensity of the Aris groin mesh to fail and cause injury and complications, and have made unfounded representations regarding the efficacy and safety of the Products through various means and media.

64.    Defendants failed to perform proper and adequate testing and research in order to determine and evaluate the nature, magnitude and frequency of the risks attendant to the Product.

65.    Defendants failed to design and establish a safe, effective procedure for removal of the Product, or to determine if a safe, effective procedure for removal of the Product exists.

66.    Feasible, suitable and safer alternatives to the Product have existed at all times relevant that do not present the same the severity of risks as do the Product.

67.    The Products were at all times utilized and implanted in a manner foreseeable to Defendants, as Defendants generated the Instructions for Use ("IFU"), created the procedures for implanting the devices, distribute instructional videos and materials, and trained the implanting physicians.

68.    Defendants knowingly provided incomplete and insufficient training and information to physicians regarding the use of the Product and the aftercare of patients implanted with the Product.

69.    As a result of these life-altering and, in some cases, permanent injuries, Plaintiff has suffered severe emotional pain and injury and has suffered and will suffer apprehension of increased risk for injuries, infections, pain, mental anguish, discharge, and multiple corrective surgeries as a result of implantation of mesh.

70.    The Products implanted in the Plaintiff was in the same or substantially similar condition as they were when they left Defendants' possession, and in the condition directed by and expected by Defendants.

71.    In many cases, including Plaintiff's, women have been forced to undergo extensive medical treatment including, but not limited to, operations to locate and remove fragments of the mesh, operations to attempt to repair pelvic organs, tissue, and nerve damage, the use of pain control and other medications, injections into various areas of the pelvis, spine, and the vagina, and operations to remove portions of the female genitalia.

72.    Removal of segments of the contracted, curled, coiled, eroded, stiffened, small pore, scar-plated and / or infected transvaginal mesh can require multiple surgical interventions and result in further scarring on fragile compromised pelvic tissue and muscles.

73.    At all relevant times herein, Defendants failed to provide sufficient warnings and instructions that would have put Plaintiff named and the general public on notice of the dangers and adverse effects caused by implantation of the Aris groin mesh.

74.    The Aris groin mesh as designed, manufactured, distributed, sold and / or supplied by Defendants was defective as marketed due to inadequate warnings, instructions, labeling and / or inadequate testing in the presence of Defendants' knowledge of lack of safety.

75.    On October 13, 2015, at the Same Day SurgiCenter of Orlando in Orlando, Florida, Plaintiff was implanted with an Aris brand transobturator vaginal mesh designed, manufactured,

packaged, labeled and sold by Defendants. The subject mesh was intended to treat Plaintiff for stress urinary incontinence, the use for which Defendants marketed the product.

76.     Plaintiff's treating physician implanted the subject mesh properly and appropriately.

77.     On September 22, 2017, after subsequent worsening of incontinence, Plaintiff underwent a repeat vaginal sling placement using another Aris brand transobturator vaginal mesh designed, manufactured, packaged, labeled and sold by Defendants.

78.     On July 17, 2020, after suffering from pelvic pain and eroded vaginal mesh into her urethra, Plaintiff underwent a vaginal suburethral removal of both Aris mesh products, and a urethral reconstruction surgery.

79.     As a direct and proximate result of the defective condition of the Coloplast Aris transobturator vaginal mesh, including but not limited to the wrongful acts, negligence, omissions and fraudulent representations of Defendants, Plaintiff suffered serious and permanent bodily injuries, including pelvic, groin and vaginal pain and suffering, complex recurring extrusions and erosions of the mesh in her body, chronic inflammation with swollen inflamed tissue in her groin and vagina, mesh adhesion to surrounding tissue, tissue damage, failure of the mesh to treat her underlying condition and worsening of stress urinary incontinence, new onset urinary and pelvic complications, mesh deformation including coiling, contracting and curling of the mesh, mesh hardening, stiffening and folding of the mesh, scar-plating, intervention for her pain, and the need for multiple painful surgical interventions to remove segments of the coiled, stiff, chronically inflamed, small pore mesh, as well as the need for continuing and future medical care and treatment. She has incurred significant expenses for medical care and treatment and will continue to incur such expenses in the future.

## COUNT I - NEGLIGENCE

80.     Plaintiff incorporates by reference paragraphs 9 - 79 of this Complaint as if fully set forth in this Count.

81.     At all times material hereto, Defendants had a duty to Plaintiff to exercise reasonable care in the design, manufacture, testing, inspection, processing, advertising, marketing, testing, labeling, assembling, packaging, distribution, warning, detailing, promotion and sale of its Aris brand groin mesh device.

82.     Defendants breached their duty and were negligent in that it failed to exercise reasonable care in the design, manufacture, testing, inspection, processing, advertising, marketing, testing, labeling, assembling, packaging, distribution, warning, detailing, promotion and sale of its Aris brand groin mesh device.

83.     As a result of said failures, the Aris brand groin mesh device implanted in Plaintiff was unreasonably dangerous and defective in design and unaccompanied by adequate warnings concerning its hazardous properties.

84.     The unreasonably dangerous condition, defects and inadequate warnings existed when the Aris brand groin mesh device implanted in Plaintiff left Defendants' custody and control.

85.     In addition, Defendants had an obligation to issue a timely post-sale warning regarding risks that became known after it either first began marketing its product and / or after Plaintiff was implanted with the Aris brand groin mesh device.

86.     Defendants were negligent in that they failed to exercise reasonable care in failing to issue a timely post-sale warning regarding risks that became known after it either first began marketing its product and / or after Plaintiff was implanted with the Aris brand groin mesh device.

87.     At all times material, Defendants failed to exercise reasonable care under the circumstances, as it knew, or in the exercise of reasonable care, should have known, that its Aris brand groin mesh device was not properly manufactured, compounded, assembled, inspected, packaged, distributed, tested, analyzed, examined, or prepared, such that the medical device was defective, unreasonably dangerous, and likely to injure its users, including Plaintiff herein.

88.     Also, Defendants failed to exercise reasonable care under the circumstances, as it knew, or in the exercise of reasonable care, should have known, that its Aris brand groin mesh devices were sold without sufficient warnings or instruction (both before as well as after their sale), such that the Aris brand groin mesh device was likely to injure its users, including Plaintiff herein.

89.     Further, Defendants failed to exercise reasonable care under the circumstances, as it knew, or in the exercise of reasonable care, should have known, that its Aris brand groin mesh device and the information (including warnings, instructions, detailing, advertising, promotion, and representations) about the characteristics and properties of the devices; the potential risks associated with its use in patients; safety and efficacy data; the attributes of the device relative to other competing medical devices; and the management of patients after implantation of this device were inaccurate or incomplete, such that the medical device was likely to injure its users, including Plaintiff herein.

90.     Defendants also failed to conduct sufficient testing, quality assurance measures and / or inspection of its Aris brand groin mesh device, both prior to and after clearance of the product for sale, which, if properly performed, would have revealed or led, long ago, to the detection of defects in the Aris brand groin mesh device and inadequacy in the warnings, promotional materials and instructions which accompanied the device, such that the injuries suffered by Plaintiff herein could have been prevented.

91.     These negligent acts by Defendants resulted in the sale of Aris brand groin mesh device that was unreasonably dangerous, unsafe, and not reasonably fit for the uses and purposes for which the medical device would ordinarily be put or some other reasonably foreseeable purpose and the unreasonably dangerous condition existed when such device, including the particular device implanted in Plaintiff, left Defendants' custody and control.

92.     Defendants knew or should have known that the Aris brand groin mesh device subjected Plaintiff to unreasonably dangerous risks of which the Plaintiff and her treating physicians would not be aware. Nevertheless, Defendants advertised, marketed, sold and distributed the Aris brand groin mesh device for years to thousands of women, at a time when Defendants knew that there were safer methods and products available for the treatment of urinary incontinence.

93.     Had Plaintiff, her treating physician, or both known of the unreasonably dangerous risks associated with the Aris brand groin mesh device at the time of her implant surgery, such knowledge would have affected the treating physicians' use of the device and Plaintiff would not have consented to the implantation of the device.

94.     As a direct and proximate result of the defective condition of the Aris brand groin mesh device, including but not limited to the wrongful acts, omissions and fraudulent representations of Defendants, Plaintiff has suffered serious and permanent injuries, including pain and suffering, loss of capacity for the enjoyment of life, pelvic, groin and vaginal pain and suffering, complex recurring extrusions and erosions of the mesh in her body, chronic inflammation with swollen inflamed tissue in her groin and vagina, mesh adhesion to surrounding tissue, tissue damage, failure of the mesh to treat her underlying condition and worsening of stress urinary incontinence, new onset urinary and pelvic complications, mesh deformation including

coiling, contracting and curling of the mesh, mesh hardening, stiffening and folding over, scar-plating, intervention for her pain including the need for multiple painful surgical interventions to remove the mesh, as well as the need for continuing and future medical care and treatment. She has incurred significant expenses for medical care and treatment and will continue to incur such expenses in the future.

95.    As a direct, proximate and foreseeable result of Defendants' negligence, Plaintiff has been damaged in an amount to be determined at trial.

## COUNT II – NEGLIGENT MISREPRESENTATION

96.    Plaintiff incorporates by reference paragraphs 9 - 79 of this Complaint as if fully set forth in this Count.

97.    As described in detail herein, Defendants made numerous false statements of material facts regarding the safety and efficacy of the Aris device to healthcare providers, and the community at large, including Plaintiff and Plaintiff's physicians. These statements were contained in advertisements, promotional materials, the Aris IFU, publications in journals, consulting and/or educational materials intended for healthcare providers, and other media.

98.    As described in detail herein, Defendants knew or should have known that these statements were false.

99.    In making these false statements, Defendants intended that Plaintiff and her healthcare providers rely on the representations so that they would purchase and use the Aris product as opposed to other, safer and more efficacious forms of treatment for SUI.

100.    As described in detail herein, Plaintiff and her treating physicians were not aware of the true extent of the risks of injury associated with the use of the Aris device at the time of

implant, and they reasonably relied on the representations made by Defendants regarding the safety and efficacy of the Aris device to influence their decisions to purchase and implant the Aris device.

101.    As a direct and proximate result of the Defendants' negligent misrepresentations, Plaintiff has suffered serious and permanent injuries, including pain and suffering, loss of capacity for the enjoyment of life, pelvic, groin and vaginal pain and suffering, complex recurring extrusions and erosions of the mesh in her body, chronic inflammation with swollen inflamed tissue in her groin and vagina, mesh adhesion to surrounding tissue, tissue damage, failure of the mesh to treat her underlying condition and worsening of stress urinary incontinence, new onset urinary and pelvic complications, mesh deformation including coiling, contracting and curling of the mesh, mesh hardening, stiffening and folding over, scar-plating, intervention for her pain including the need for painful surgical interventions to remove the mesh, as well as the need for continuing and future medical care and treatment. She has incurred significant expenses for medical care and treatment and will continue to incur such expenses in the future.

### COUNT III – GROSS NEGLIGENCE

102.    Plaintiff incorporates by reference paragraphs 9 - 79 of this Complaint as if fully set forth in this Count.

103.    In committing the acts and / or omissions set forth herein that directly and proximately caused Plaintiff's injuries, as set forth herein, Defendants breached its duty to Plaintiff and demonstrated a conscious, reckless, willful and wanton indifference to and disregard of the consequences of its actions and / or omissions.

104.    Defendants were grossly negligent by showing a complete indifference for the safety and health of Plaintiff and other similarly situated, in negligently designing, packaging, labeling, marketing, advertising, promoting, distributing and selling a defective and unreasonably

dangerous product and in negligently failing to warn Plaintiff of the significant risks and complications associated with its device, as set forth above.

105.    In light of the knowledge Defendants had concerning the risks and complications associated with its device, as set forth above, Defendants continued to show an utter disregard and complete indifference for the safety of Plaintiff by failing to provide adequate warnings concerning the risks and complications associated with its sling device, making material misrepresentations and placing profits from sales of its device over the safety of patients receiving its device.

106.    The wrongs done by Defendants were aggravated by the kind of malice, fraud, and grossly negligent disregard for the rights of others, the public, and Plaintiff for which the law would allow, and for which Plaintiff seeks exemplary damages, in that Defendants' conduct, including the failure to comply with applicable industry standards was specifically intended to cause substantial injury to Plaintiff; or when viewed objectively from Defendants' standpoint at the time of the conduct, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others, including Plaintiff, and Defendants were actually, subjectively aware of the risk involved, but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of others, including Plaintiff; or included a material representation that was false, with Defendants knowing that it was false or with reckless disregard as to its truth and as a positive assertion, with the intent that the representation is acted on by Plaintiff.

107.    As a direct and proximate result of the Defendants' gross negligence, Plaintiff has suffered serious and permanent injuries, including pain and suffering, loss of capacity for the enjoyment of life, pelvic, groin and vaginal pain and suffering, complex recurring extrusions and erosions of the mesh in her body, chronic inflammation with swollen inflamed tissue in her groin and vagina, mesh adhesion to surrounding tissue, tissue damage, failure of the mesh to treat her

underlying condition and worsening of stress urinary incontinence, new onset urinary and pelvic complications, mesh deformation including coiling, contracting and curling of the mesh, mesh hardening, stiffening and folding over, scar-plating, intervention for her pain including the need for painful surgical interventions to remove the mesh, as well as the need for continuing and future medical care and treatment. She has incurred significant expenses for medical care and treatment and will continue to incur such expenses in the future.

## COUNT IV – STRICT LIABILITY: DESIGN DEFECT

108.    Plaintiff incorporates by reference paragraphs 9 - 79 of this Complaint as if fully set forth in this Count.

109.    The Aris groin mesh, as designed, was not reasonable safe for its intended use and was defective as described herein with respect to its design.

110.    The unique design features of Aris mesh, as described in detail herein, rendered the device unsafe, these design features include that the mesh is stiff, has small pores, has no protective sheath, is implanted in the groin and vagina.

111.    Feasible alternative designs were possible at the time of Defendants' manufacture of the Aris groin mesh implanted in Plaintiff.

112.    Other manufacturers of similar treatments and products had already put safer alternatives into use at the time of Defendants' manufacture of the Aris groin mesh implanted in Plaintiff.

113.    These safer alternatives minimized the risks associated with the unique design features of the Aris groin mesh, eliminated the risks associated with the unique design features, and eliminated or reduced the frequency, severity, and duration of the risks associated with the Aris groin mesh.

114.     As a direct and proximate result of the Defendants' defective design of the device, Plaintiff has suffered serious and permanent injuries, including pain and suffering, loss of capacity for the enjoyment of life, pelvic, groin and vaginal pain and suffering, complex recurring extrusions and erosions of the mesh in her body, chronic inflammation with swollen inflamed tissue in her groin and vagina, mesh adhesion to surrounding tissue, tissue damage, failure of the mesh to treat her underlying condition and worsening of stress urinary incontinence, new onset urinary and pelvic complications, mesh deformation including coiling, contracting and curling of the mesh, mesh hardening, stiffening and folding over, scar-plating, intervention for her pain including the need for painful surgical interventions to remove the mesh, as well as the need for continuing and future medical care and treatment. She has incurred significant expenses for medical care and treatment and will continue to incur such expenses in the future.

## COUNT V – STRICT LIABILITY: FAILURE TO WARN

115.     Plaintiff incorporates by reference paragraphs 9 - 79 of this Complaint as if fully set forth in this Count.

116.     The Aris device implanted in Plaintiff was not reasonably safe for its intended uses and was defective, as described herein, as a matter of law due to its lack of appropriate and necessary warnings.

117.     Defendants were under a duty to disclose to Plaintiff and her physicians the defective nature of the Defendants' device, including, but not limited to, the heightened risks of erosion, pain, failure, and permanent injury, and the design characteristics which exacerbated or created unreasonable risks, and material safety information about the device.

118.     In representations to Plaintiff and / or to Plaintiff's healthcare providers, Defendant failed to warn about the following risks, and others, involved with the use of the Aris:

a)   That the Defendants' mesh device was not as safe as other products, treatments and procedures available to treat incontinence;

b)   That the risk of adverse events with the Defendants' device was higher than with other products, treatments and procedures available to treat incontinence;

c)   The Defendants' device was not adequately tested;

d)   That Defendants deliberately failed to follow up on the adverse results from formal and informal reports from physicians and other healthcare providers and buried and / or misrepresented those findings;

e)   That Defendants were aware of dangers in the Defendants' device in addition to and above and beyond those associated with other products, treatments and procedures available to treat incontinence;

f)   That the Defendants' device was defective, and caused dangerous and adverse side effects, including but not limited to higher incidence of erosions, extrusions, adverse tissue response and rejection, contraction, migration, trauma, groin pain, vaginal pain, failure, and revision surgeries at a much more significant rate than other products, treatments and procedures available to treat incontinence;

g)   That patients needed to be monitored more regularly than usual while using the Defendants' device and that in the event the product needed to be attempted to revised or be removed that the procedures to remove segments of the product had a very high failure rate and / or needed to be performed repeatedly;

h)   That the Defendants' device was manufactured negligently;

i)   That the Defendants' device was manufactured defectively;

j)   That the Defendants' device was designed negligently, and designed defectively.

119.   If the Defendants provided full and accurate warnings with the Aris device to the Plaintiff or her healthcare providers prior to the implantations on October 13, 2015 and September 22, 2017, the Aris devices would not have been implanted inside the Plaintiff. The inadequate warnings provided with the Aris proximately caused the Plaintiff's injuries.

120.   As a direct and proximate result of the Defendants' failure to warn, Plaintiff has suffered serious and permanent injuries, including pain and suffering, loss of capacity for the

enjoyment of life, pelvic, groin and vaginal pain and suffering, complex recurring extrusions and erosions of the mesh in her body, chronic inflammation with swollen inflamed tissue in her groin and vagina, mesh adhesion to surrounding tissue, tissue damage, failure of the mesh to treat her underlying condition and worsening of stress urinary incontinence, new onset urinary and pelvic complications, mesh deformation including coiling, contracting and curling of the mesh, mesh hardening, stiffening and folding over, scar-plating, intervention for her pain including the need for painful surgical interventions to remove the mesh, as well as the need for continuing and future medical care and treatment. She has incurred significant expenses for medical care and treatment and will continue to incur such expenses in the future.

## COUNT VI – STRICT LIABILITY: MANUFACTURING DEFECT

121.    Plaintiff incorporates by reference paragraphs 9 - 79 of this Complaint as if fully set forth in this Count.

122.    The Aris devices implanted in Plaintiff were not reasonably safe for their intended use and were defective, as described herein, as a matter of law with respect to its manufacture in that the Aris device deviated materially from the Defendants' design and manufacturing specifications in such a manner as to pose unreasonable risks of serious bodily harm to Plaintiff

123.    The Defendants' Aris device is inherently dangerous and defective, unfit and unsafe for its intended and reasonably foreseeable use, and does not meet or perform to the expectations of patients, including Plaintiff, and their healthcare providers, including Plaintiff's implanting surgeons.

124.    The Aris device creates risks to the health and safety of the patients, including Plaintiff, that are far more significant and devastating than the risks posed by other products and

procedures available to treat the corresponding medical conditions and which far outweigh the utility of the Aris device.

125.    The device, as manufactured, did not perform as intended.

126.    The device was defective when it left the Defendants' control as a result of a flaw in the manufacturing process, workmanship, and / or materials of which the product was made.

127.    As a direct and proximate result of the Defendants' manufacturing defect, Plaintiff has suffered serious and permanent injuries, including pain and suffering, loss of capacity for the enjoyment of life, pelvic, groin and vaginal pain and suffering, complex recurring extrusions and erosions of the mesh in her body, chronic inflammation, mesh adhesion to surrounding tissue, tissue damage, failure of the mesh to treat her underlying condition and worsening of stress urinary incontinence, new onset urinary and pelvic complications, mesh deformation including coiling, contracting and curling of the mesh, mesh hardening, stiffening and folding over, scar-plating, intervention for her pain including the need for painful surgical interventions to remove the mesh, as well as the need for continuing and future medical care and treatment. She has incurred significant expenses for medical care and treatment and will continue to incur such expenses in the future.

## COUNT VII – FRAUDULENT CONCEALMENT

128.    Plaintiff incorporates by reference paragraphs 9 - 79 of this Complaint as if fully set forth in this Count.

129.    Defendants falsely and fraudulently have represented and continue to represent to the medical and healthcare community, Plaintiff, her treating physicians, and the public that the Aris brand groin mesh device had been tested and were found to be safe and effective.

130.     Specifically, at all relevant times, including at the times Plaintiff consented to and was implanted with the Aris groin mesh, Defendants represented the Aris brand groin mesh device offered "high success and low complications," offered "permanent" treatment, and was "minimally invasive."

131.     Defendants touted, at all relevant times, including at the time Plaintiff consented to and was implanted with the Aris groin mesh, the design of the Aris brand groin mesh device minimized inflammation, minimized tissue trauma, offered "optimal tissue integration" and performed "similar to collagen fibers" where the mesh is implanted.

132.     Defendants touted, at all relevant times, including at the time Plaintiff consented to and was implanted with the Aris groin mesh, the design of the Aris brand groin mesh device contained large pores, was "less dense" than alternative mesh on the market and due to the lack of a protective sheath minimized tissue trauma.

133.     Defendants concealed the design the Aris groin mesh contained the smallest pores of any mesh still on the market today, was similar in the design and performance to the Mentor Obtape, which was removed from the market for safety reasons, safety data on the design of the Aris groin mesh, specifically long-term data, was lacking, safety and efficacy of the Aris groin mesh was not established, there were high complication rates associated with the mesh, the mesh did not offer permanent treatment, the stiff and rigid characteristic of the mesh made it dangerous and increased the risks of injury in patients, the small pores of the mesh made it dangerous and increased the risks of injury in patients, the lack of a protective sheath increased tissue trauma and tissue death when the stiff and rigid mesh was passed through the body, the mesh's design made it unreasonably susceptible to contracting, migrating, not holding in place and eroding through vaginal tissue and organs, the presence of the mesh in the groin offered no benefit in treating

incontinence and caused injury to the groin nerve bundles and tissue and Defendants had no sufficient scientific basis for statements in the Aris groin mesh promotional materials, specifically but not limited to the Aris groin mesh was "similar to collagen" fibers in the vagina and groin and the design of the mesh minimized tissue trauma when passed through the body and minimized the inflammatory response.

134.    The representations made by Defendants were, in fact, false and the omissions were misleading and fraudulent. When Defendants made the representations and omissions, Defendants knew and / or had reason to know that those representations were false and the omissions were misleading, and Defendants willfully, wantonly, and recklessly disregarded the inaccuracies in the representations and the dangers and health risks to users of the Aris groin mesh device, including Plaintiff and her treating physicians.

135.    These representations and omissions were made by Defendants with the intent of defrauding and deceiving the medical community, Plaintiff, her treating physicians, and the public, and also inducing the medical community, Plaintiff, her treating physicians, and the public, to recommend, prescribe, dispense, and purchase the Aris groin mesh for use as a means of treatment for urinary incontinence, all of which evinced a callous, reckless, willful, and depraved indifference to the health, safety, and welfare of Plaintiff.

136.    In representations to Plaintiff and / or to Plaintiff's healthcare providers, Defendant fraudulently concealed and intentionally omitted the statements described herein and below which were material in nature:

    a)    That the Defendants' mesh device was not as safe as other products, treatments and procedures available to treat incontinence;

    b)    That the risk of adverse events with the Defendants' device was higher than with other products, treatments and procedures available to treat incontinence;

c)  The Defendants' device was not adequately tested;

d)  That Defendants deliberately failed to follow up on the adverse results from formal and informal reports from physicians and other healthcare providers and buried and / or misrepresented those findings;

e)  That Defendants were aware of dangers in the Defendants' device in addition to and above and beyond those associated with other products, treatments and procedures available to treat incontinence;

f)  That the Defendants' device was defective, and caused dangerous and adverse side effects, including but not limited to higher incidence of erosions, extrusions, adverse tissue response and rejection, contraction, migration, trauma, groin pain, vaginal pain, failure, and revision surgeries at a much more significant rate than other products, treatments and procedures available to treat incontinence;

g)  That patients needed to be monitored more regularly than usual while using the Defendants' device and that in the event the product needed to be attempted to revise or be removed that the procedures to remove segments of the product had a very high failure rate and / or needed to be performed repeatedly;

h)  That the Defendants' device was manufactured negligently;

i)  That the Defendants' device was manufactured defectively;

j)  That the Defendants' device was designed negligently, and designed defectively.

137.  Defendants were under a duty to disclose to Plaintiff and her physicians the defective nature of the Defendants' device, including, but not limited to, the heightened risks of erosion, pain, failure, and permanent injury, and the design characteristics which exacerbated or created unreasonable risks, and material safety information about the device.

138.  Defendants had sole access to material facts concerning the defective nature of the products and their propensity to cause serious and dangerous side effects and hence, cause dangerous injuries and damage to persons who used the Defendants' device.

139.  Defendants' concealment and omissions of material fact concerning the safety of the Product were made purposefully, willfully, wantonly, and / or recklessly to mislead, to cause

Plaintiff's treating physician to recommend, purchase, prescribe, and / or dispense the device; and / or to mislead Plaintiff into reliance and cause Plaintiff to have the device permanently implanted in her body.

140.    At the time these representations and omissions were made by Defendants, and at the time Plaintiff was implanted with the device, Plaintiff and her treating physician were unaware of the falsehood of these representations, misleading nature of omissions and statements, and reasonably believed them to be true.

141.    Defendant knew and had reason to know that its device could and would cause severe and grievous personal injury to the patients implanted with the of the device, and that the device was inherently dangerous in a manner that exceeded any purported, inaccurate, or otherwise downplayed warnings.

142.    In reliance upon these false representations, Plaintiff and her treating physician were induced to, and did use the device, thereby causing Plaintiff to sustain severe personal injuries and damages. Defendants knew or had reason to know that Plaintiff and her treating physician and other healthcare providers had no way to determine the truth behind Defendants' concealment and omissions, and that these included material omissions of facts surrounding the use of the Defendants' device, as described in detail herein.

143.    Plaintiff and her treating physician reasonably relied on revealed facts provided by Defendants, but were unaware of purposefully suppressed and concealed facts that were critical to understanding the real dangers inherent in the use of the Defendants' device.

144.    If Plaintiff, her treating physician, or both would have been made aware of these purposefully suppressed and concealed facts, as set forth herein, Plaintiff would not have used or

consented to the implantation of the device and her treating physician would have used the device differently, warned about it differently or not used it at all.

145.   Having knowledge based upon Defendants' research and testing, or lack thereof, Defendants blatantly and intentionally distributed false information, including but not limited to assuring Plaintiff, the public, and Plaintiff's healthcare providers and physicians, that the Defendants' device was safe for use as a means of providing relief from urinary incontinence and were as safe or safer than other products, treatments and / or procedures available and on the market. As a result of Defendants' research and testing, or lack thereof, Defendants intentionally omitted, concealed and suppressed certain results of testing and research to healthcare professionals, Plaintiff, her treating physician, and the public at large.

146.   Defendants had a duty when disseminating information to the public to disseminate truthful information and a parallel duty not to deceive the public, Plaintiff and Plaintiff's healthcare providers.

147.   The information distributed to the public, the medical community, Plaintiff, and her treating physicians by Defendants included, but was not limited to websites, information presented at medical and professional meetings, information disseminated by sales representatives to physicians and other medical care providers, reports, press releases, advertising campaigns, television commercials, print advertisements, billboards and other commercial media containing material representations, which were false and misleading, and contained omissions and concealment of the truth about the dangers of the use of the Defendants' device.

148.   Defendants intentionally failed to inform the public, including Plaintiff and her treating physicians, of the high failure rate including erosion, extrusion, contraction, groin and

vaginal pain, the difficulty or impossibility of removing the mesh, and the risk of significant irreversible injury.

149.    Defendants chose to over-promote the purported safety, efficacy and benefits of the Defendants' device instead.

150.    Defendants' intent and purpose in making these misrepresentations was to deceive and defraud the public, the medical community, Plaintiff, and her treating physicians; to gain the confidence of the public, the medical community, Plaintiff, and her treating physicians; to falsely assure them of the quality and fitness for use of the device; and induce Plaintiff, and her treating physician, the public and the medical community to request, recommend, prescribe, dispense, purchase, and continue to use the Defendants' device.

151.    Defendant made claims and representations in its promotional materials to healthcare professionals and patients that the Defendants' device had innovative beneficial properties that increased the safety of the device which Defendants knew or should have known were false and misleading with the intention for patients and doctors to rely on the claims and choose Defendants' the device over safer alternatives.

152.    These representations, and others made by Defendants, were false when made and / or were made with the pretense of actual knowledge when such knowledge did not actually exist and were made recklessly and without regard to the true facts.

153.    These representations, and others made by Defendant, were made with the intention of deceiving and defrauding Plaintiff, Plaintiff's healthcare professionals and other members of the healthcare community, and were made in order to induce Plaintiff and her healthcare professionals to rely on misrepresentations and caused Plaintiff to purchase, rely, use, and request

the Defendants' device and her healthcare professional to dispense, recommend, or prescribe Defendants' device.

154.    Defendants recklessly and / or intentionally represented false, dangerous, and serious health and safety concerns inherent in the use of Defendants' device to the public at large, for the purpose of influencing the sales of products known to be dangerous and defective, and / or not as safe as other alternatives.

155.    Defendants willfully and intentionally failed to disclose the truth, failed to disclose material facts, and made false representations for the purpose of deceiving and lulling Plaintiff and her treating physician into a false sense of security, so that Plaintiff and her treating physician would rely on Defendants' representations, and Plaintiff would request and purchase the Defendants' device and that her healthcare providers would dispense, prescribe, and recommend Defendants' device.

156.    Defendants utilized direct-to-consumer advertising to market, promote, and advertise the Defendants' device.

157.    At the time the representations were made, Plaintiff and her treating physician did not know the truth about the dangers and serious health and / or safety risks inherent in the use of the Defendants' device. Plaintiff did not discover the true facts about the dangers and serious health and / or safety risks, nor did Plaintiff discover the false representations of Defendants, nor would Plaintiff with reasonable diligence have discovered the true facts or Defendants' misrepresentations.

158.    Defendants' wrongful conduct constitutes fraud and deceit and was committed and perpetrated willfully, wantonly, and / or purposefully on Plaintiff.

159.     As a direct and proximate result of the Defendants' conduct, Plaintiff has suffered serious and permanent injuries, including pain and suffering, loss of capacity for the enjoyment of life, pelvic, groin and vaginal pain and suffering, complex recurring extrusions and erosions of the mesh in her body, chronic inflammation with swollen inflamed tissue in her groin and vagina, mesh adhesion to surrounding tissue, tissue damage, failure of the mesh to treat her underlying condition and worsening of stress urinary incontinence, new onset urinary and pelvic complications, mesh deformation including coiling, contracting and curling of the mesh, mesh hardening, stiffening and folding over, scar-plating, intervention for her pain including the need for painful surgical interventions to remove the mesh, as well as the need for continuing and future medical care and treatment. She has incurred significant expenses for medical care and treatment and will continue to incur such expenses in the future.

## COUNT VIII – PUNITIVE DAMAGES

160.     Plaintiff incorporates by reference paragraphs 9 - 79 of this Complaint as if fully set forth in this Count.

161.     Defendants sold the device to Plaintiff's healthcare providers and other healthcare providers in the State of Florida and throughout the United States without doing adequate testing to ensure that the device was reasonably safe for implantation in the female pelvic area.

162.     Defendants sold the device to Plaintiff's health care providers and other health care providers in the State of Florida and throughout the United States in spite of their knowledge that the device caused severe complications and injuries, including, but not limited to the injuries suffered by Plaintiff.

163.     At all times relevant hereto, Defendants knew or should have known that the device was inherently dangerous with respect to the risks of life-long irreversible injuries, complex

recurring erosions, extrusions, failure, pain and suffering, loss of life's enjoyment, remedial surgeries and treatments in an effort to treat the conditions proximately related to the use of the product, as well as other severe and personal injuries which are permanent and lasting in nature.

164.    At all times material hereto, Defendants misrepresented material safety facts about the safety of the device.

165.    Defendants' misrepresentations included knowingly withholding material information from the medical community and the public, including Plaintiff and her treating physicians, concerning the safety and efficacy of the device.

166.    At all times material hereto, Defendants knew and intentionally and / or recklessly disregarded the fact that the devices cause debilitating, irreversible and catastrophic side effects with greater frequency than safer alternative products and / or methods of treatment and recklessly failed to advise healthcare providers, Plaintiff, her treating physician, the public of same.

167.    At all times material hereto, Defendants intentionally misstated and misrepresented data and continue to misrepresent data so as to minimize the true and accurate risk of injuries and complications caused by the devices.

168.    Notwithstanding the foregoing, Defendants continue to aggressively market the device to consumers, including Plaintiff and her treating physician, without disclosing the true risk of side effects and complications and with fraudulent claims.

169.    Defendants know of the devices' defective and unreasonably dangerous nature, but continue to manufacture, produce, assemble, market, distribute, and sell the devices so as to maximize sales and profits at the expense of the health and safety of the public, including Plaintiff, in conscious or reckless disregard of the foreseeable harm caused by the devices.

170.    Defendants continue to intentionally or recklessly conceal or exercise gross negligence in failing to disclose to the public, including Plaintiff, the serious side effects of the device in order to ensure continued and increased sales.

171.    Defendants intentionally, recklessly or negligently failed to disclose information deprived Plaintiff and the public of necessary information to enable them to weigh the true risks of using the device against the benefits. The Defendants' failure constitutes willful or wanton behavior, or gross negligence.

172.    As a direct and proximate result of the foregoing acts and omissions, Plaintiff has required and will require health care and services, and has incurred medical, health care, incidental, and related expenses. Plaintiff is informed and believe and further allege that Plaintiff will in the future be required to obtain further medical care and / or hospital care and medical services.

173.    Defendants' conduct, as described herein, shows willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which raises the presumption of conscious indifference to consequences, thereby justifying an award of punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, for the reasons stated above, Plaintiff Sally Martin respectfully requests that she be awarded a judgment against Defendants for the following:

a)    Actual damages;

b)    Prejudgment and postjudgment interest;

c)    Punitive or exemplary damages;

d)    Attorneys' fees;

e)    Costs of suit; and

f)    All other relief the Court deems appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury in this action.

<u>Dated</u>: August 5, 2021

Respectfully submitted,

**THE MAHER LAW FIRM**

<u>/s/ *Jason R. Fraxedas*</u>
Jason R. Fraxedas, Esq.
Florida Bar # 63887
Matthew S. Mokwa, Esq.
Florida Bar # 47761
The Maher Law Firm
271 West Canton Avenue, Suite 1
Winter Park, FL 32789
407-839-0866
jrfraxedas@maherlawfirm.com
mmokwa@maherlawfirm.com

**ATTORNEYS FOR PLAINTIFF**